# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | | |
|---|---|---|
| MICAH D. KALENOWSKI, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 2:20-cv-01743-GMN-MDC |
| | ) | |
| vs. | ) | **ORDER ON MOTIONS FOR** |
| | ) | **SUMMARY JUDGMENT** |
| CITY OF LAS VEGAS, *et. al.*, | ) | |
| | ) | |
| Defendants. | ) | |

Pending before the Court are four Motions for Summary Judgment, filed by the four remaining Defendants in this case. The first Motion for Summary Judgment, (ECF No. 103), was filed by Defendant Las Vegas Metropolitan Police Department ("LVMPD"). Plaintiff Micah Kalenowski filed a Response, (ECF No. 115), to which LVMPD filed a Reply, (ECF No. 124). The second Motion for Summary Judgment, (ECF No. 104), was filed by Defendant Jordan Miller. Plaintiff filed a Response, (ECF No. 118), to which Miller filed a Reply, (ECF No. 125). The third Motion for Summary Judgment, (ECF No. 105), was filed by Defendant M. Martin. Plaintiff filed a Response, (ECF No. 114), to which Martin filed a Reply, (ECF No. 126). Lastly, the fourth Motion for Summary Judgment, (ECF No. 106), was filed by Defendant Brian Fortner. Plaintiff filed a Response, (ECF No. 117), to which Fortner filed a Reply, (ECF No. 127).

For the reasons below, the Court **GRANTS** Summary Judgment as to the LVMPD and Officers Martin and Fortner, and **DENIES** Summary Judgment as to Officer Miller,

## I.      BACKGROUND

This case arises from Plaintiff Micah Kalenowski's arrest in 2018. (*See generally* First Am. Compl. ("FAC"), ECF No. 25). On the night of his arrest, Kalenowski, his girlfriend, and several friends went to the TAO Night Club in Las Vegas. (Plaintiff Dep. 55:21–56:3, Ex. 8 to

Resp. to Martin Mot. Summ. J. ("MSJ"), ECF No. 114-8).  Kalenowski had consumed his first alcoholic drink at about 7:00 PM, had a beer with dinner, and then drank three vodka mixed drinks at TAO Night Club. (*Id.* 64:13–19).  After Kalenowski and his friends had been at TAO for about an hour and a half, security officers instructed Kalenowski to follow them to an exterior staircase and informed him that LVMPD was called because a waitress reported Kalenowski had inappropriately touched her. (*Id.* 65:6–23).  LVMPD Officers Martin and Fortner were on "special event" duty at TAO and met Kalenowski and the security officers in the staircase. (*Id.* 66:14–15); (Martin Dep. 72:3–7, Ex. B to Martin MSJ, ECF No. 105-2).

A TAO security guard informed Officer Martin that Kalenowski "inappropriately touched one of the waitresses," so Officer Martin instructed Kalenowski to face the wall and put his palms together behind his back for a pat down search. (Martin Bodycam Video at 2:20– 2:30, Ex. C to Martin MSJ, ECF No. 105-3).  Kalenowski struggled to put his palms together and told the officers that he did not understand what he was supposed to do. (*Id.* 2:30–2:51). When he finally assumed the correct posture, he insisted, "I'm not against you guys," "I support you," and "I didn't know I offended a female." (*Id.* 3:10–3:41).  Officer Martin then reached to check Kalenowski's front right pocket, and Kalenowski jerked his right elbow back. (*Id.* 3:50–4:10).  Officer Martin put a hand on Kalenowski's elbow, saying, "Don't do that to me!" (*Id.*).

**A. Officer Martin Puts Kalenowski in Handcuffs**

Officer Martin told Kalenowski that because he was being cooperative, he would not be put in handcuffs, but warned that if he became uncooperative, he'd be handcuffed. (*Id.* 4:15– 4:25).  The officers proceeded to tell Kalenowksi to turn around and face them, but he remained facing the wall with his hands behind his back. (*Id.* 4:30–4:45).  He became irritated, saying "I'm not a fucking dickhead . . . this is bullshit, man." (*Id.* 4:45–5:00).  Because Kalenowski ignored the orders, Officer Martin handcuffed him. (*Id.* 4:55–5:20).  Officer Martin checked for

tightness as he applied the handcuffs and double-locked them so they could not become tighter once applied. (*Id.* 5:50–6:10); (Martin Dep. 121:24–122:4). Officer Martin informed Kalenowski that he was being detained, to which Kalenowski replied, "that makes no fucking sense" and "I'm suing everybody." (Martin Bodycam Video at 5:45–6:15, Ex. C to Martin MSJ). Kalenowski then told the officers that he had bulging discs in his spine from an accident in which he was rear-ended, and again insisted that he respected the officers. (*Id.* 6:20–7:28).

Officers Martin, Fortner, and the TAO security guards escorted Kalenowski back through a loud hall in the nightclub to the security office, and Kalenowski is heard saying, "This is embarrassing. This is where the lawsuit comes in." (*Id.* 7:40–8:40). He also yelled "lawsuit!" to another patron as he walked by. (*Id.*). The officers instructed Kalenowski to sit in a chair in a back hallway, which he did. (*Id.* 8:50–9:10).

After leaving Kalenowski in the hallway with Officer Fortner, Officer Martin walked into an office to speak to the waitress who reported being inappropriately touched by Kalenowski. (*Id.* 10:00–15:00). The waitress described Kalenowski as "really, really drunk" and that he was doing a "hump dance" toward girls in the club who were telling him no. (*Id.*). When he asked her to make him a drink at the table, she agreed, and he began touching her back and moved his hand down to her buttocks. (*Id.*). In her victim statement, she wrote that he reached under her dress to touch her bare buttocks, at which point she shouted at him. (Victim Statement, Ex. 5 to Martin MSJ, ECF No. 105-5).

Later, while Officers Martin and Fortner were discussing criminal charges in a different part of the hallway, Kalenowski banged his head into a wall. (Plaintiff Dep. 73:15–20, Ex. 8 to Resp. to Martin MSJ). Bodycam footage does not show Kalenowski hitting his head, but instead cuts to a scene showing an EMT assessing Kalenowski on the ground. (Martin Bodycam Footage at 0:00–1:00, Ex. C to Martin MSJ); (Plaintiff Dep. 75:1–2, Ex. 8 to Resp. to Martin MSJ). EMT Caleb Norcia responded to the scene. He found a strong, rapid pulse and

noted "no obvious injuries such as abrasions, lesions, bleeding, or discoloration to wrists." (Norcia Decl. 2:3–5, Ex. F to Martin MSJ, ECF No. 150-7).  Because Kalenowski continued to move around and be uncooperative, the EMTs and Officers placed him on the gurney to prevent further injury, and the Officers decided to leave the handcuffs on. (*Id.* 2:5–7); (Martin Bodycam Footage at 1:45–2:15, Ex. C to Martin MSJ).  Officer Fortner told Kalenowski, "it's going to be really uncomfortable," and applied a strap to keep Kalenowski on his side rather than laying on the handcuffs behind his back. (*Id.*).  Kalenowski then opened his eyes and stated, "Fuck you guys . . . I just want to be in a hospital." (*Id.* 2:40–3:00).  EMT Norcia offered to take Kalenowski to the hospital, but he refused. (Norcia Decl. 1:22–24, Ex. F to Martin MSJ).

As Kalenowski was taken outside, he stated that he was in pain and that his wrists hurt. (Martin Bodycam Footage at 3:00–3:10, Ex. C to Martin MSJ).  Officer Fortner testified it was the first time Kalenowski mentioned feeling pain. (Fortner Dep. 160:12–15, Ex. D to Martin MSJ, ECF No. 105-4).  On the bodycam, Kalenowski is heard saying, "let me go, man . . . let my wrists loose a little bit." (Martin Bodycam Footage at 3:00–3:15, Ex. C to Martin MSJ).

When the gurney arrived at the patrol car, Kalenowski told the officers that his arm hurt and that he wanted to sit up. (Martin Outside Bodycam Footage at 1:30–1:55, Ex. C to Martin MSJ).  The officers helped him swing his legs to the side so that he could sit on the gurney. (*Id.*).  Officer Fortner then took Kalenoski's elbow and directed him to sit in the back of the patrol car. (*Id.* 2:00–3:00).  When Kalenowski complained that the seat was uncomfortable, Officer Fortner testified that he advised Kalenowski on the most comfortable way to position his hands and did a visual check of his handcuffs. (*Id.*); (Fortner Dep. 161:1–10, Ex. D to Martin MSJ).  Kalenowski denied that Officer Fortner advised him to interlock his hands. (Resp. to Request for Admission at 10, Ex. W to Reply to Fortner MSJ, ECF No. 127-1).

### B.  Officer Miller Arrives in Transport Van and Takes Kalenowski to CCDC

Soon after, Officers Miller and Turner pulled up to the scene in a transport van to take Kalenowski to Clark County Detention Center ("CCDC"). (Turner's Bodycam Footage 00:00– 1:50, Ex. C to Martin MSJ, ECF No. 105-3).  Officer Turner is not a Defendant in this case, and Defendant Officer Miller's primary responsibility was to drive the van. (Miller Dep. 75:8–9, Ex. H to Martin MSJ, ECF No. 105-8).  Officer Turner found Kalenowski asleep in patrol car and woke him up. (Turner's Bodycam Footage 2:20–2:40, Ex. C to Martin MSJ).  Kalenowski told him that he urinated because the other officers would not let him use the bathroom. (*Id.* 3:30–3:52).

Following a pat down, Officer Turner removed the hinged handcuffs applied by Officer Martin and attached belly handcuffs, which allowed Kalenowski to keep his hands at his side. (*Id.* 8:00–9:23).  A red line can be seen on Kalenowski's wrists from the hinged handcuffs. (*Id.*).  As Officer Turner unlocked Kalenowki's right hand, Kalenowski complained that his right hand hurt. (*Id.* 9:20–9:40).  Officer Turner lifted the sleeve of Kalenowski's shirt before reattaching the belly handcuffs to his left hand and told Kalenowski that he was lifting the sleeve "so it's not tight." (*Id.* 10:25–10:45).

Once the belly handcuffs were in place, Officer Turner walked Kalenowski around to the back of the van and asked him to sit on the bumper. (*Id.* 12:00–12:45).  Kalenowski did as he was asked, and Officer Turner began to remove Kalenowski's shoes. (*Id.* 12:40–12:50). Because Officer Turner struggled to unknot the second shoe, Kalenowki bent to the side to unknot the shoe with his right hand. (*Id.* 15:15–15:50).  Kalenowski then climbed into the back of the van. (*Id.* 18:40–19:10).  Officer Miller, the van driver and a Defendant in this case, stated in his deposition that Kalenowski appeared to be under the influence and was crying intermittently. (Miller Dep. 8:3–5, Ex. A to Miller MSJ, ECF No. 104-1).

### C. Kalenowski Arrives at CCDC

Officers Miller and Turner were cleared from picking up Kalenowski at 2:52 AM and made stops to pick up other arrestees on their way to CCDC. (*Id.* 25:9–16). Kalenowski remained in the belly handcuffs while sitting in the van and was positioned right behind the driver's seat. (Plaintiff Dep. 80:2–6; 91:1–2, Ex. 8 to Resp. to MartinMSJ). Kalenowski testified that he "was pleading for assistance" through the metal mesh and asking Officer Miller to loosen the handcuffs because he was in pain. (*Id.* 91:3–23; 92:8–93:1). Officer Miller did not check Kalenowski's handcuffs or loosen them throughout the duration of the drive to CCDC. (*Id.*). Kalenowski further testified that when he asked for help, he was told to shut up. (*Id.*).

The van arrived at CCDC at 5:28 AM, and Kalenowski was told to sit on a bench, still in his belly handcuffs. (Plaintiff Dep. 94:14–96:21, Ex. 8 to Resp. to Martin MSJ). He fell asleep on the bench, and when he was woken up at 7:00 AM to complete paperwork, he realized that his hands were numb. (*Id.*). Kalenowski was taken to be fingerprinted, and his handcuffs were removed. (*Id.* 96:22–25). Kalenowki then received his first medical screening and was placed into different side cells, but he was not in handcuffs in either cell. (*Id.* 107:24). At 7:26 AM, Kalenowski had his second medical assessment. (*Id.* 104:4–22); (Physical Assessment, Ex. F to Miller MSJ, ECF No. 104-6). The Nurse checked the box for "no injuries or infections on extremities." (Physical Assessment at 338, Ex. F to Miller MSJ).

### D. Kalenowski's Medical Care

The day Kalenowski was released from CCDC, he took pictures of his hands and wrists that show redness, swelling, and a cut from the handcuffs. (Photos, Ex. 9 to Resp. Martin MSJ, ECF No. 114-9). The next day, Kalenowski sought medical care from his primary care physician, Dr. Tanner, because feeling in his wrists did not return. (Plaintiff Dep. 122:11–123:21, Ex. 8 to Resp. to Martin MSJ). She gave him a tetanus shot due to the laceration on his

wrist and referred him to a neurologist. (Medical Records at 113–17, Ex. 10 to Resp. Martin MSJ, ECF No. 114-10).  Dr. Tanner noted abrasions to Kalenowski's right wrist, swelling of both wrists, and reported that Kalenowski complained of "decreased sensation to bilat fingers." (*Id.* at 116–17, Ex. 10 to Resp. Martin MSJ).

A few months later, Dr. Tanner saw Kalenowski again for "bilateral hand numbness" and referred him to a specialist, Dr. Heller, because of his numbness and pain. (*Id.* at 115).  Dr. Heller diagnosed Kalenowski with carpal tunnel syndrome in his left wrist, "post low median palsy from compression injury which occurred to the wrist," and "tenosynovitis of the flexor tendons." (*Id.* at 138).  Kalenowski underwent carpel tunnel release surgery on his left wrist on February 7, 2019. (*Id.*).  Dr. Heller further diagnosed right wrist carpal tunnel, right Guyon canal syndrome, and severe flexor tenosynovitis. (*Id.* at 143).  In July 2019, Kalenowski had surgery for his right wrist carpal tunnel and Guyon canal syndrome. (*Id.*).

As a result of his injuries, Kalenowski brings a 42 U.S.C. § 1983 claim for excessive force against the Officer Defendants and a 42 U.S.C. § 1983 claim for *Monell* municipality liability against LVMPD. (*See generally* FAC).  The four Defendants filed four separate Motions for Summary Judgment.

**II.**       <u>**LEGAL STANDARD**</u>

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is a sufficient evidentiary basis on which a reasonable fact-finder could rely to find for the nonmoving party. *See id.*  "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or

judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)).  "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quotation marks and citation omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is

sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  However, the nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts," *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.  In other words, the nonmoving party cannot avoid summary judgment by "relying solely on conclusory allegations unsupported by factual data." *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

## III.        <u>DISCUSSION</u>

The three Defendant Officers move for summary judgment on Kalenowski's excessive force claim and argue they are entitled to summary judgment.  Defendant LVMPD also moves for summary judgment on Kalenowski's *Monell* municipal liability claim.  Because the *Monell* claim requires an underlying constitutional violation by one of the LVMPD Officers, the Court will first address whether summary judgment is warranted for the Defendant Officers.

## A. Officer Martin

The Court begins its analysis with Officer Martin, the officer who placed the initial set of hinged handcuffs on Kalenowski. Officer Martin makes multiple arguments for summary judgment, including that he used reasonable force when properly applying the hinged handcuffs, and that he is entitled to qualified immunity. (*See generally* Martin MSJ, ECF No. 105). Before the Court evaluates those arguments, it will address Officer Martin's claim that the first handcuffing incident is not at issue because Kalenowski did not properly raise the allegation in his FAC. (*Id.* 16:18–17:22).

### 1. The First Handcuffing Incident is Included in the First Amended Complaint

Officer Martin's initial two arguments for summary judgment are related: first, that he was not the officer who attached Kalenowski's belly handcuffs, and second, that the FAC does not implicate his initial application of hinged handcuffs. (*Id.* 14:19–17:25). While the Court agrees that evidence shows Officer Martin was not the one who attached the belly handcuffs, the Court disagrees that Officer Martin's initial application of the hinged handcuffs is not included in Kalenowski's excessive force claim.

Reading the FAC liberally and focusing on its substance over form, the Court finds that it contains adequate allegations concerning the way in which Officer Martin arrested and initially handcuffed Kalenowski. Although Officer Martin is correct that the FAC does not explicitly allege that both sets of handcuffs were too tight, it is clear from the excessive force allegations that Kalenowski is including the entirety of the Officers' actions during his arrest and seizure. (*See* FAC ¶ 52) ("Defendant LVMPD officers . . . who were in charge of Plaintiff's arrest, seizure, and custody . . . used excessive force when arresting Plaintiff in violation of rights granted to him under the Fourth Amendment . . . ."). The FAC further alleges that in both Plaintiff's seizure and detention, the Officers' force was unnecessary and unreasonable. (*Id.* ¶ 61).

Kalenowski noted in his Motion to Amend that Defendants might ask the Court to infer that the FAC alleges only that the second set of handcuffs were too tight. (Mot Amend 5:17–6:3, ECF No. 82).  Rather than conceding that the FAC is unclear on this issue, Kalenowski explains that he used the general word "handcuffs" to refer to both sets of handcuffs in the FAC. (*See* FAC. ¶ 19).  Although he included separate allegations for the belly handcuffs, this was not done to allege that *only* the second pair of handcuffs caused the injury. (Mot. Amend 5:17–6:3).  The Court will therefore evaluate the excessive force claim as to both instances of handcuffing, beginning with Officer Martin's initial application of the hinged handcuffs.

## 2. Excessive Force

Having decided that the allegations against Officer Martin include Kalenowski's arrest, the Court will now determine whether a genuine issue of material fact exists as to whether Officer Martin used excessive force against Kalenowski.  Excessive force allegations are examined under the Fourth Amendment's prohibition on unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394 (1989).  When judging the reasonableness of the force used, Courts consider the following illustrative but non-exhaustive factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.  This inquiry must be viewed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*  Courts also consider the government's interest in the use of force, as well as the balance between "the gravity of the intrusion on the individual" and "the government's need for that intrusion." *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003).  Summary judgment is appropriate "if the . . . court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *See Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

1

> ###### i.    *The Type and Amount of Force Used; Injury to Detainee*

2        The first step of the excessive force inquiry requires the Court to "assess the severity of

3    the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount

4    of force inflicted.'" *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010)

5    (quoting *Miller*, 340 F.3d at 964).  The use of handcuffs in effecting an arrest is "standard

6    practice." *Palacios v. City of Oakland*, 970 F. Supp. 732, 741 (N.D. Cal. 1997).  Even when

7    properly applied, handcuffs are "uncomfortable and unpleasant." *LaLonde*, 204 F.3d at 964

8    (Trott, J., concurring in part, dissenting in part).  The issue of tight handcuffing is usually fact-

9    specific and is likely to turn on the credibility of the witnesses. *LaLonde v. Cnty. of Riverside*,

10   204 F.3d 947, 960 (9th Cir. 2000).  Unreasonably injuring a person's wrists while applying

11   handcuffs constitutes excessive force. *See Hansen v. Black*, 885 F.2d 642, 645 (9th Cir. 1989).

12        When courts have found excessive force from tight handcuffing, "the arrestee was either

13   in visible pain, complained of pain, alerted the officer to pre-existing injuries," sustained severe

14   injuries, was in handcuffs for a long period of time, asked to have the tight handcuffs loosened,

15   "and/or alleged other forms of abusive conduct in conjunction with the tight handcuffing."

16   *Shaw v. City of Redondo Beach*, No. CV05-0481SVWFMOX, 2005 WL 6117549, at *8 (C.D.

17   Cal. Aug. 23, 2005).  For example, in *Palmer v. Sanderson*, the Ninth Circuit held that tight

18   handcuffs constituted excessive force when they caused pain and bruising lasting several

19   weeks, and the officer refused to loosen the handcuffs after the plaintiff complained. 9 F.3d

20   1433, 1436 (9th Cir. 1993).  Similarly, in *Hansen v. Black*, an officer's application of handcuffs

21   was determined to be excessive force when the handcuffs were put on "in an abusive manner"

22   and the plaintiff sustained injuries including bruises and pain in her fingers, wrists, and arm.

23   885 F.2d at 645.  And in *Ward v. Gates*, the Court held that a reasonable jury could have found

24   that the officers used excessive force against the plaintiff when she told the officers her

25   handcuffs were too tight, the officers refused to loosen them after they were no longer

1  concerned for their safety, and the handcuffs caused bruising. 52 F. App'x 341, 346 (9th Cir.
2  2002).

3      Beginning with the initial application of the handcuffs, Officer Martin presents evidence
4  that the handcuffs were properly applied.  The bodycam footage shows Officer Martin
5  attaching the handcuffs in a slow and careful manner, and only after his orders to turn around
6  were ignored and Kalenowski became irritated.  Officer Martin testified that he applied the
7  handcuffs consistently with his 24-year career and instructorship in use of force, checked the
8  handcuffs for proper tightness, and double-locked them. (Martin. Dep. 121:24–122:4, Ex. B to
9  Martin MSJ).  Officer Fortner saw Officer Martin apply the handcuffs and agreed they had
10 been checked for tightness and double locked. (Fortner Dep. 155:4–6, Ex. D to Martin MSJ).
11 Once handcuffs are double-locked, as long as they are appropriately applied, they cannot
12 become "too tight." (*Id.* 155:8–13).  Additionally, an image captured by the bodycam shows a
13 gap of space between Kalenowski's inner left wrist and the cuff. (Martin Bodycam Video at
14 6:22–6:35, Ex. C to Martin MSJ).

15     Officer Martin also presents evidence that an EMT evaluated Kalenowski after he hit his
16 head on the wall and determined that Kalenowski had a strong pulse with no obvious injuries to
17 his wrists. (Norcia Decl. 2:3–5, Ex. F to Martin MSJ, ECF No. 150-7).  The EMT testified that
18 he found "no obvious injuries such as abrasions, lesions, bleeding, or discoloration to wrists"
19 and noted "no other obvious signs of injuries." (*Id.*).  And when the EMT asked if Kalenowski
20 wanted to go to the hospital, he said no. (*Id.* 1:22–24).

21     It is only after Kalenowski hit his head and is moved onto the gurney that he mentions
22 any discomfort.  As he is taken outside on the gurney, he says that his wrists hurt, and asks for
23 them to be "let loose a little." (Martin Bodycam Footage at 3:00–3:15, Ex. C to Martin MSJ).
24 Based on the fact that bodycam footage never shows Kalenowski complaining of pain until
25 after he is strapped to the gurney, it was reasonable for Officer Martin to assume the wrist pain

was caused by the gurney, not by excessively tight handcuffs.  Even though Officer Martin did not check the tightness of the handcuffs or loosen them after Kalenowski complained, it was further reasonable that he did not want to rely solely on the gurney restraints after Kalenowski acted unpredictably and slammed his head. (Martin Dep. 110:22–112:8, Ex. B to Martin MSJ). And when Officer Martin asked the EMTs whether the handcuffs should be removed, the EMTs did not tell him that they should be.  In fact, they noted no injuries to Kalenowski's wrists.

Kalenowski's actions outside by the patrol car further provide support for Officer Martin's position.  When the gurney arrived at the patrol car, Kalenowski tells the officers that his arm hurt and that he wanted to sit up. (Martin Outside Bodycam Footage at 1:30–1:55, Ex. C to Martin MSJ).  Kalenowski did not mention the tightness of his handcuffs, and Officer Martin helped him swing his legs to the side of the gurney so he could sit up. (*Id.*).  Kalenowski then falls asleep in the patrol car and is woken up by Officer Turner, who removes the hinged handcuffs to apply belly handcuffs.  (Turner's Bodycam Footage 2:20–10:45, Ex. C to Martin MSJ).  A red line is visible on his wrists, but no additional lacerations or swelling can be seen. (*Id.* 8:00–9:23, Ex. C to Martin MSJ).

Thus, judging Officer Martin's actions from the perspective of a reasonable officer on the scene, and not one with 20/20 hindsight, the Court finds sufficient evidence that he used minimal force with an uncooperative Kalenowski. *See Graham*, 490 U.S. at 396.  Because Officer Martin satisfied his initial burden, the burden shifts to Kalenowski to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  While Plaintiff provides some evidence that the first handcuffing may have contributed to his injuries, it is not enough to require a jury to resolve the differing versions of the truth at trial, nor is it enough for reasonable jurors to return a verdict in his favor.

Turning now to the level of injury sustained by Kalenowski, his medical records do not create a genuine issue of material fact surrounding the tightness of the hinged handcuffs.  As mentioned above, when the hinged handcuffs are removed, there is no visual injury to Kalenowski.  The handcuffs left a red line imprint, but there is no clear swelling or laceration.  When Kalenowski left CCDC the next morning, his wrists appeared red, slightly swollen, and had a small laceration. (Photos, Ex. 9 to Resp. to Martin MSJ).  But this was after he fell asleep in CCDC with the handcuffs on, and the CCDC physical examination noted "no injuries or infections on extremities." (Naphcare Exam, Ex. O to Martin MSJ, ECF No. 105-15).  Swelling, bruising, and a small laceration are not indicative of the use of excessive force. *See Smith v. Cnty. of Orange*, 678 F. Supp. 3d 1182, 1211 (C.D. Cal. 2023) ("[T]he Deputies' handcuffing Plaintiff in a manner where the handcuffs gave her bruises for three weeks and potentially a small laceration was not excessive.").  However, in addition to any initial injury, Kalenowski underwent two surgeries over the following months for carpal tunnel and Guyon canal syndrome. (Medical Records at 138–43, Ex. 10 to Resp. Martin MSJ).  As discussed below regarding Officer Miller, Kalenowski has provided sufficient evidence to dispute general claims of lack of causation.  But as applied to Officer Martin and the first handcuffing, Kalenowski's evidence is not enough to create a dispute of material fact as to the first handcuffing specifically.

Kalenowski's testimony that his handcuffs "were initially very tight" and that "he was vocal about it the entire time . . . ." is contradicted by the bodycam footage. (Plaintiff Dep. 70:17–71:11, Ex. 8 to Resp. to Martin MSJ).  He stated that the handcuffs caused him pain beginning with their initial application, and that he complained about the pain while walking through the stairs. (*Id.* 71:4–9).  But the bodycam footage audio was on and there is no audio of Kalenowski complaining about handcuff pain.  Instead, the bodycam footage clearly picks up Kalenowski saying "This is where the lawsuit comes in" and yelling "lawsuit!" (Martin

Bodycam Video at 7:40–8:40, Ex. C to Martin MSJ).  Considering all the evidence, the Court finds that the type and amount of force used was minimal.

        *ii.*    *City's Interest in Use of Force*

      When evaluating the second step of this excessive force analysis, courts consider non-exclusive factors such as "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Miller*, 340 F.3d at 964.  These factors are set forth in *Graham*, 490 U.S. at 396.  Viewing the facts in the light most favorable to Kalenowski, the totality of the circumstances justified Officer Martin's decision to apply handcuffs.

      Beginning with the severity of the crime, the state court found that probable cause existed to arrest Kalenowski for Open and Gross Lewdness in violation of NRS § 201.210, which is a gross misdemeanor in Nevada. (Martin MSJ 23:20–24); (Prelim. Hearing, Ex. K to Martin MSJ, ECF No. 105-11).  Though Kalenowski may not have been attempting to evade arrest, his unpredictable behavior, verbal hostility, intoxication, and inconsistent compliance with basic orders, leads the Court to conclude that it was reasonable for Officer Martin apply handcuffs and leave them on throughout the interaction. (*See* Norcia Decl. 1:19–21, Ex. G to Martin MSJ) ("Patient was found however intoxicated and aggressive towards both EMS, police, and nightclub staff.  Patient was found uncooperative and would not elaborate on any medical complaints or current symptoms."); (*see also* Fortner Dep. 162:24–163:3, Ex. D to Officer Martin's MSJ) ("When he stops following our directions and starts tensing up and resisting us from putting him in handcuffs initially, he's pulling his arms apart and tightening his body. Those are all pre-indicators of aggression.).

      The final step requires the Court to balance the intrusion of Officer Martin's handcuffing with the City's need to detain Kalenowski.  The Court finds no genuine disputes of material

1    fact precluding summary judgment as to whether the handcuffs were applied too tightly.

2    Therefore, resolving all factual disputes in Kalenowski's favor, summary judgment is

3    appropriate. *See Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) (explaining that summary

4    judgment is appropriate "if the . . . court concludes, after resolving all factual disputes in favor

5    of the plaintiff, that the officer's use of force was objectively reasonable under the

6    circumstances.").  Accordingly, the Court GRANTS summary judgment for Officer Martin.

7        **B.  Officer Fortner**

8        The Court turns next to Officer Fortner, who did not apply either set of handcuffs to

9    Kalenowski but who was with Kalenowski during the relevant time period, beginning with their

10   initial interaction on the stairs.  Kalenowski's excessive force claim against Officer Fortner is

11   based on the Officer's failure to loosen the handcuffs after he complained of pain. (Resp. to

12   MSJ Fortner 12:18–20, ECF No. 117).

13       Officer Fortner has also provided sufficient evidence to demonstrate that his conduct

14   was objectively reasonable and did not rise to excessive force.  He saw Officer Martin double

15   lock the handcuffs and check for their tightness, so he concluded there was "no chance" the

16   handcuffs were too tight. (Fortner Dep. 155:4–13, Ex. D to Martin MSJ).  Officer Fortner first

17   heard Kalenowski complain on the gurney when his bodyweight was on the cuffs, so he

18   positioned Kalenowski's body to relieve the pressure and apply gurney straps to keep him on

19   his side. (*Id.* 83:16–20).  He also heard Kalenowski state that his "wrists hurt" on the gurney,

20   but didn't physically check the handcuffs at that time because he was supposed to wait until it

21   was safe to do so. (*Id.* 154:17–22).  Instead, he did a visual check of the handcuffs and

22   determined they were properly applied. (*Id.* 155:25–157:10).  He also gave Kalenowski advice

23   on how he could position his hands to alleviate his pain while on the gurney. (*Id.* 165:20–23);

24   (Martin Bodycam Footage at 1:00–1:55, Ex. C to Martin MSJ).  Fortner testified that based on

25   Kalenowski's unpredictable demeanor, such as slamming his head into the wall, Kalenowski's

behavior was unsafe to both himself and the officers, and thus it was too much of a danger to loosen the handcuffs or rely solely on the gurney restraints. (Fortner Dep. 158:14–18; 161:24–162:9, Ex. D to Martin MSJ).

The parties dispute whether Officer Fortner properly checked the tightness of Kalenowski's handcuffs when he helped Kalenowski get into the patrol car. When Plaintiff's counsel asked whether Officer Fortner physically checked the handcuffs at that time, he responded, "Yeah. Like, when we're getting him in the car, I'm actually looking behind him. I'm actually looking and grabbing him. Like I said, any time you grab the handcuffs – you can place your fingers inside of it." (*Id.* 160:22–161:3). Once Kalenowski sat in the patrol car, Officer Fortner suggested how to sit to alleviate the pain, but did not loosen the handcuffs because "they were appropriately applied." (*Id.* 161:6–15). Kalenowski argues that Officer Fortner did not physically check the handcuffs for tightness. (Resp. to MSJ Fortner, 14:3–4) (citing Fortner Dep. 106:1–3; 157:10–20, Ex. D to Martin MSJ). In fact, he claims that a review of the bodycam footage does not show Officer Fortner touching Kalenowski's handcuffs at all. (*Id.* 14:9–13). Officer Fortner's Reply states that he "evaluated" and "looked" at the handcuffs to check for proper tightness. (Reply to Fortner MSJ 5:13–17).

Whether Officer Fortner physically checked the handcuffs, or only visually checked them, is not a material dispute requiring a judge or jury to resolve the parties' differing versions of the truth. The LVMPD Policy does not explicitly require a physical check. Rather, the Policy requires that when someone in handcuffs complains that the handcuffs are too tight or are causing pain, "the officer having custody of the handcuffed subject will, as soon as reasonably possible, check the handcuffs to make sure that they are not too tight. If they are too tight (per training), they will be loosened and double locked." (LVMPD Policy 2018 at 371–72, Ex. C to LVMPD MSJ, ECF No. 103-3). According to Officer Fortner, LVMPD

policy requires officers to check for tightness when an arrestee complains, and that includes a "visual" check for tightness. (Fortner Dep. 165:20–23, Ex. D to Martin MSJ).

In this case, because of all the evidence demonstrating a lack of excessive force by Officer Fortner who went out of his way to help Kalenowski be comfortable in his handcuffs, a visual check is reasonable. Kalenowski's evidence would not lead a reasonable jury to find that Officer Fortner used excessive force due to a potential failure to physically check the tightness of his handcuffs. And evaluating the same *Graham* factors as the Court did above for Officer Martin, a reasonable jury would agree with Officer Fortner's decision to leave the handcuffs on Kalenowski due to his erratic behavior.

Officer Fortner's Motion for Summary Judgment is therefore GRANTED.

### C. Officer Miller

Officer Miller, the driver of the CCDC transport van, also moves for summary judgment. Kalenowski's claim against Officer Miller is based on his testimony that throughout the three-hour drive to CCDC, he was "pleading for assistance" for Officer Miller to loosen the handcuffs, but Officer Miller did not check or loosen the handcuffs, despite stopping multiple times. (Plaintiff Dep. 91:3–23; 92:8–93:1, Ex. 8 to Resp. to Martin MSJ).

### 1. Excessive Force

To determine whether the amount of force used against Kalenowski was excessive, the Court evaluates the following illustrative but non-exhaustive factors: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). As explained above, when characterizing the quantum of force used in handcuffing, the determination depends on specific factual circumstances such as whether the handcuffs caused

1   more than nominal injuries to the plaintiff, whether the arrestee was in handcuffs for significant
2   period of time, and whether the officers refused to loosen the handcuffs after the plaintiff
3   complained.  It may be unreasonable for an officer to refuse to check or loosen an arrestee's
4   handcuffs when the arrestee complains of pain.

5          In this case, there is a material dispute of fact as to whether Kalenowski complained to
6   Officer Miller while sitting in the van for over two hours.  Officer Miller meets his initial
7   burden by providing evidence that he did not hear Kalenowski complain that his wrists were
8   hurting from the handcuffs while he was sitting in the van. (Miller Dep. 49:10–14, Ex. A to
9   Miller MSJ).  Officer Miller testified that even though the transport van had a mesh partition
10  between the driver and passengers so that the driver can hear what is happening in the back, he
11  did not hear Kalenowski complain about his handcuffs being too tight. (*Id.* 25:21–25).  He also
12  explained, like the other Officers in this case, that if an arrestee complains that handcuffs are
13  too tight, the officer should check to make sure they are not too tight. (*Id.* 31:21–32:7).  Officer
14  Turner's bodycam footage does not show Kalenowski complaining that the belly handcuffs
15  were too tight before he climbed into the transport van, and there is no bodycam footage
16  provided after Kalenowski enters the back of the van.

17         The burden now shifts to Kalenowski to provide evidence demonstrating a material
18  dispute of fact, which he succeeds in doing.  Kalenowski testified that he was sitting directly
19  behind Officer Miller, with the metal mesh between them, and that he could hear the officers
20  talking in the front of the van. (Plaintiff Dep. 91:1–11, Ex. 8 to Resp. to Martin MSJ).  He
21  states that he was pleading for assistance and to have his handcuffs loosened "throughout the
22  trip." (*Id.* 91:10–13; 92:21–23).  To get the attention of the officers, he pleaded for the officers
23  to "Please loosen my handcuffs" and said, "This hurts." (*Id.* 92:16–20).  When asked if the
24  officers responded back to him, he testified that at one point an officer told him to "shut the
25  fuck up." (*Id.* 92:23–93:3).

Officer Miller argues that it would not have been safe for him to stop and check Kalenowski's handcuffs because he continued to pick up five additional arrestees, who outnumbered the officers. (Miller MSJ 3:21–4:1). But, when Kalenowski was loaded into the van, he was the only passenger. (Plaintiff Dep. 89:16–90:9, Ex. 8 to Resp. to Martin MSJ). And he testified that he complained about the pain "throughout the trip." (*Id.* 92:21–23). So, the Court is unable to state that as a matter of law, Officer Miller's refusal to assist Kalenowski was reasonable. Thus, because a dispute of material fact exists as to whether Kalenowski complained to Officer Miller that he was in pain because his handcuffs were too tight, summary judgment is not appropriate.

## 2. Causation

The parties dispute to what extent Kalenowski's injuries were the result of handcuffing. Officer Miller presents evidence that Kalenowski's injuries could be the result of other factors, such as his employment or weightlifting hobby. (Dr. Liu Dep. 10:1–20; 24:12–21, Ex. N to Martin MSJ, ECF No. 105-14). Additionally, Dr. Liu testified that the cause of Kalenowski's wrist injury could have been his own actions of falling asleep with the handcuffs on while intoxicated. (*Id.* 31:8–32:20). Officer Miller also submits evidence that Kalenowski reported symptoms consistent with carpal tunnel syndrome before his arrest in 2018. (*See id.* 10:1–11); (2017 Medical Records, Ex. P to Martin MSJ, ECF No. 105-16).

But Kalenowki sufficiently creates a genuine dispute of material fact with his own expert testimony and doctor's reports. Kalenowki's medical expert opined that to a reasonable degree of medical certainty "his bilateral hand CTS are causally related to the incident that occurred on 09/23/2018. All treatments for his carpal tunnel syndrome including the surgical release are causally related to the incident on 09/23/2018." (Dr. Liu Report at 3, Ex. 11 to Resp. to Martin MSJ, ECF No. 114-11). Dr. Liu reaffirmed his conclusion in a supplemental report. (Dr. Liu Supp. Report at 1, Ex. 18 to Resp. to Martin MSJ, ECF No. 114-18) ("[T]he

handcuffing mechanism in Mr. Kalenowski's case is consistent with the cause of Carpal Tunnel Syndrome (CTS). "Handcuff neuropathy" is a known entity."). But Officer Miller presents his own expert report negating Dr. Liu's findings and opining that Dr. Liu did not review sufficient information to state to a reasonable degree of medical certainty that the injuries were caused by the handcuffs. (McKenzie Rebuttal Report at 4, Ex. V to Reply to Martin MSJ, ECF No. 126-2); (*see also* McKenzie Report, Ex. U to Reply to Martin MSJ, ECF No. 126-1). In addition to the expert testimony, Kalenowski's doctor wrote that his carpal tunnel was due to a "compression injury." (Medical Records at 0138, Ex. 10 to Resp. to Martin MSJ).

While the denial of summary judgment may be subject to reconsideration at the Rule 50 stage of proceedings, a genuine dispute of material facts currently exists as to the causation of Kalenowski's wrist injuries.

### 3. Qualified Immunity

Having found a material dispute of fact, the Court must now address Officer Miller's qualified immunity claim. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) ("The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"). Thus, to overcome a claim of immunity, plaintiffs must plead "facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *al-Kidd*, 563 U.S. at 735.

As noted above, whether Officer Miller violated Kalenowski's constitutional rights involves disputes of material fact. Turning to the second prong, a right is "clearly established" when "the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *al-Kidd*, 563 U.S. at 741 (cleaned up). The Supreme Court has "'repeatedly told courts . . . not to define clearly established law at a high level of generality,' since doing so avoids the crucial question [of] whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (quoting *al-Kidd*, 563 U.S. at 742) (internal citation omitted). Although defeating a qualified immunity claim on summary judgment does not require a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate" for a right to be clearly established. *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

"To deny immunity, [the court] must conclude that every reasonable official would have understood, beyond debate, that the conduct was a violation of a constitutional right." *Martinez v. City of Clovis*, 943 F.3d 1260, 1275 (9th Cir. 2019). For purposes of qualified immunity, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Courts should ask "whether the state of the law" at the time of Defendants' conduct provided "fair warning" that their actions were unconstitutional. *Id.*

Once the defense of qualified immunity is raised by the defendant, the plaintiff bears the burden of showing that the rights allegedly violated were "clearly established." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000). In his Response, Kalenowski argues that the Ninth Circuit has already determined that it is clearly established that overly tight handcuffing can constitute excessive force. (Resp. to Miller MSJ 14:15–15:3). Plaintiff cites multiple Ninth Circuit cases, including *Palmer* cited by the Court above, in which the Ninth Circuit has denied

qualified immunity to officers who placed and kept the plaintiff in tight handcuffs for a long period of time without loosening them upon request. (*Id.* 28:10–23).  Given the number of Ninth Circuit cases on overly tight handcuffing, the state of the law provided Officer Miller with "fair warning" that leaving Kalenowski in overly tight handcuffs for an extended period of time was unconstitutional.  *See Hope*, 536 U.S. at 741.

In certain Ninth Circuit cases cited by Plaintiff, the court denied qualified immunity for excessive handcuffing claims even when there was no evidence of a particularly violent arrest if the plaintiff suffered more than nominal injuries and officers ignored their complaints of pain. *See, e.g.*, *Thompson*, 607 Fed. App'x at 625 (denying qualified immunity even though plaintiff had no visible physical injury because plaintiff was pulled out of his car, handcuffed, and officers ignored his requests that officers loosen his handcuffs); *Palmer*, 9 F.3d at 1436 (9th Cir. 1993) (denying qualified immunity when the plaintiff was jerked out of their car, frisked, handcuffed tight enough to cause pain and bruising for several weeks, and the officer refused to loosen the handcuffs).  "A reasonable agent in [defendant's] position would have known, in July 1998, that to place and keep [plaintiff] in handcuffs that were so tight that they caused her unnecessary pain violated her Fourth Amendment right to be free from an unreasonable seizure." *Meredith v. Erath*, 342 F.3d 1057, 1063 (9th Cir. 2003).  Officer Miller's request for qualified immunity is therefore denied, and the Court DENIES Officer Miller's Motion for Summary Judgment.

### D.  Las Vegas Metropolitan Police Department

Lastly, the Court will determine whether LVMPD should be granted summary judgment on Kalenowski's *Monell* claim.  Kalenowski argues that (1) LVMPD's policy amounted to deliberate indifference to his constitutional right and was the moving force in the violation against him, (2) LVMPD was inadequately training its officers, (3) there was a widespread

practice or custom of excessive handcuffing at the time he was injured, and (4) LVMPD failed to investigate and discipline officers for excessive handcuffing. (FAC ¶ 70–155).

To impose *Monell* liability on a municipality under Section 1983, a plaintiff must demonstrate that (1) they were deprived of a constitutional right; "(2) the municipality had a policy; (3) the policy amounts to deliberate indifference to [the plaintiff's] constitutional right; and (4) the policy is the moving force behind the constitutional violation." *Gordon v. County of Orange*, 6 F.4th 961, 973 (9th Cir. 2021) (internal quotation marks and citation omitted).  A plaintiff can satisfy *Monell*'s policy requirement by demonstrating that either (1) the action was taken pursuant to an expressly adopted official policy, (2) the public entity followed a longstanding practice or custom, such as by failing to implement procedural safeguards or failing to train adequately, or (3) the individual who committed the tort was an official with final policy-making authority of such an official ratified a subordinate's unconstitutional decision. *Id.* at 973–74.  There must be a "direct causal link" between the relevant policy and the constitutional injury at issue. *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 681 (9th Cir. 2021) (citing *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1075 (9th Cir. 2016).

### 1. LVMPD's Expressly Adopted Policy

The first way that Plaintiff may prove LVMPD's liability is if the Officers were acting "pursuant to an expressly adopted official policy." *See Thomas v. Cnty. of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014) (per curiam) (citing *Monell*, 436 U.S. at 694).  The city's policy must reflect "deliberate indifference to the constitutional rights of its inhabitants." *Castro*, 833 F.3d at 1073 (en banc) (citing *City of Canton v. Harris*, 489 U.S. 378, 392 (1989)).

LVMPD's policy on handcuffing in 2018, when Kalenowski was injured, instructed officers to "check handcuffs for tightness and double lock as soon as it is safe to do so before transport." (LVMPD Policy 2018 at 371–72, Ex. C to LVMPD MSJ, ECF No. 103-3).  It also requires that when someone in handcuffs complains that the handcuffs are too tight or are

causing pain, "the officer having custody of the handcuffed subject will, as soon as reasonably possible, check the handcuffs to make sure that they are not too tight.  If they are too tight (per training), they will be loosened and double locked." (*Id.*).  Kalenowski argues that because the policy gives discretion to officers to check handcuffs "as soon as it is safe to do so" and "as soon as reasonably possible," this policy was unconstitutional and amounts to deliberate indifference to an arrestee's right to be free from overly tight handcuffing. (Resp. to LVMPD MSJ 7:3–8:4, ECF No. 115).

LVMPD disagrees because it is not objectively unreasonably for officers to finish their investigation and clear the area before addressing complaints about handcuffs being too tight. (LVMPD MSJ 11:1–9) (citing, *e.g.*, *Beltran v. Cnty. of Los Angeles*, 401 F. App'x 182, 184 (9th Cir. 2010) ("Beltran was not subjected to excessive force because, given the undisputed facts, it was objectively reasonable for the deputies to finish their initial investigation of the residence and to clear the area before addressing Beltran's complaints about his handcuffs being too tight.")).

Although Kalenowski is correct that applying excessively tight handcuffs and refusing to loosen them may constitute excessive force, he does not cite a case in which a court has found that the officers must check the handcuffs immediately, regardless of concern for their safety or their duty to conduct a timely investigation.  Rather than amounting to deliberate indifference to constitutional rights, the LVMPD policy takes case law into account by instructing officers to check handcuffs "as soon as it is safe to do so" and "as soon as reasonably possible." Kalenowski also argues that the 2020 amendment omitting the "safe to do so" language is proof that the earlier policy was unconstitutional, but the amendment alone is not enough to create a triable issue on the 2018 policy's alleged deliberate indifference. *See, e.g.*, *Chavez v. Las Vegas Metro. Police Dep't*, 648 F. App'x 657, 658 (9th Cir. 2016) ("[Plaintiff's] assertion that LVMPD revamped its use of force policy subsequent to the shooting of [Defendant], even if

true, is insufficient to raise a triable issue that at the time of the shooting LVMPD had a policy or practice of tolerating constitutional violations.")  Because Plaintiff fails to provide sufficient evidence of a deliberately indifferent policy, the Court will next evaluate his argument based on LVMPD's alleged pattern or custom of similar handcuffing violations.

### 2.  Widespread practice or custom of excessive handcuffing

The second way a plaintiff can establish a *Monell* policy is by demonstrating that the employee who committed the constitutional tort acted pursuant to the municipal employer's longstanding practice or custom. *See Gordon*, 6 F.4th at 973 (internal citations omitted).  The custom or informal policy "must be a 'deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" *Castro*, 833 F.3d at 1075 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion)).  "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (citations omitted).  A custom can be inferred from "evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded." *Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir. 1992); *see also Meehan v. Los Angeles Cnty.*, 856 F.2d 102, 107 (9th Cir. 1988) (holding that two incidents were not sufficient to establish a "custom" for *Monell* liability).

Here, Kalenowski argues that he has provided the Court with evidence of over 100 instances in which arrestees were injured by LVMPD officers' application of handcuffs, and that this is enough to establish a disputed issue of fact regarding a widespread unconstitutional practice. (Resp. to LVMPD MSJ 15:11–24, ECF No. 115).  For example, Kalenowski references LVMPD's "Use of Force and Vehicle Pursuit Annual 5-Year Statistical Report

2015–2019," which includes a chart of reported non-deadly use of force handcuffing incidents depicting 176 incidents in 2015, 149 in 2016, 153 in 2017, and 140 in 2018. (Use of Force Chart at 56, Ex. 8 to FAC, ECF No. 25-3).  LVMPD reported 207,419 arrests in 2016, 2017, and 2018 combined. (LVMPD MSJ 21:15–19) (citing LVMPD Policy 2018 at 371, Ex. C to LVMPD MSJ, Ex. 103-3); (Annual Report 2018 at 2730, Ex. A to LVMPD MSJ, ECF No. 103-1).  If the Court assumes that each incident report was a constitutional excessive force violation, then in the three years leading up to Kalenowski's arrest, 2016 through 2018, .21% of arrests led to excessive force handcuffing violations.

LVMPD argues this number should be even lower.  It asserts that only .051% of arrests led to excessive force handcuffing because the number of Use of Force Reports reflect not only instances of force outside of LVMPD's policy, but also injuries or complaints that could have been self-inflicted by the detainee or were the result of reasonable force. (LVMPD MSJ 18:6–22:18).  LVMPD instead identified only 99 Use of Force Reports during the three-year time period reflecting an incident in which an injury or complaint could be related to handcuffing. (*Id.*).

Viewing Kalenowski's evidence in the light most favorable to him, the submitted reports and news articles fall short of creating a material dispute of fact that LVMPD has a "persistent and widespread" practice of attaching excessively tight handcuffs that constitute a "permanent and well settled" city policy.  Neither .21% or .051% of arrests leading to handcuffing complaints is adequate to establish a "sufficient duration, frequency and consistency" such that excessive handcuffing has "become a traditional method" of carrying out arrests. *See Trevino*, 99 F.3d at 918.  Further, the Use of Force Reports are not sufficient evidence of constitutional violations; tight handcuffs do not necessarily become constitutional violations in every situation.  Indeed, some of the reports include statements that officers checked for the tightness of the handcuffs upon application, double-locked them, and checked for tightness when the

suspect complained. (Use of Force Reports at 2908, 3335, 3595, 3786, Ex. P to LVMPD MSJ, ECF No. 103-13).

Kalenowski notes two other examples of LVMPD harming individuals by leaving tight handcuffs on. The first is Danny Romero in 2014, and his handcuffing led to a case that LVMPD settled for $85,000 in 2014. (FAC ¶ 145). The second incident occurred when Michael Bennett was handcuffed in 2017 leading to numbness in his fingers. (*Id.* ¶ 91). But Kalenowski does not allege that either of these incidents were found to constitute a constitutional violation, and a settlement, without more, does not establish that a violation existed. Thus, to the extent Kalenowski attempts to prove an informal policy based on violations for which the officers were not disciplined, he has not provided sufficient evidence of such constitutional violations.

Even though the question of whether a policy or custom exists would typically be left to the jury, "when there are no genuine issues of material fact and the plaintiff has failed to establish a prima facie case, disposition by summary judgment is appropriate." *Trevino v. Gates*, 99 F.3d at 918. The defendants met their initial burden, and Kalenowski failed to provide evidence sufficient to establish that there is a genuine issue of material fact as to LVMPD's *Monell* liability based on an informal custom.

### 3. Failure to Train

Kalenowski's last argument for LVMPD's liability is based on its alleged failure to train its officers in 2018 when he was injured. (FAC ¶ 149–155). To establish *Monell* liability for a failure to train, a plaintiff must show not only that the training was inadequate, but also that the local governmental entity was deliberately indifferent to its constituents' constitutional rights. *See City of Canton*, 489 U.S. at 388. Simply that more or better training might have avoided the constitutional violation is insufficient to assign liability; instead, the choice not to train must be deliberate. *See id.* at 392. Failure to train may amount to a policy of "deliberate

indifference" if the need to train was obvious and the failure to do so made a violation of constitutional rights likely. *Id.* at 390. Similarly, a failure to supervise that is "sufficiently inadequate" may amount to "deliberate indifference." *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989). Mere negligence in training or supervision, however, does not give rise to a Monell claim. *Id.*

LVMPD's evidence demonstrates that its officers received annual use of force training, which included training on proper handcuffing. (LVMPD Policy 2018 at 371, Ex. C to LVMPD MSJ, ECF No. 103-3). Handcuffing training occurs in a classroom setting, as well as via printed materials. (Defensive Tactics Manual 2017 at 4410–34, Ex. H to LVMPD MSJ, Ex. 103-8); (Defensive Tactics Manual 2018 at 4636–37, Ex. I to LVMPD MSJ, Ex. 103-9). Handcuffing training is also provided to new officers through the Academy. (Academy Training at 5199–521, Ex. K to LVMPD MSJ, ECF No. 103-11).

Kalenowski makes multiple arguments in response. First, he responds that these training policies are inadequate because the officers in this case were training officers who cited the LVMPD policy as the reason they did not check his handcuffs in a timely manner, or at all. (Resp. to LVMPD MSJ 13:25–14:11, ECF No. 115). But, "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton*, 489 U.S. 378 (1989). Second, he argues that the use of force reports, plus an opinion by his expert, Chief Tiderington, demonstrate a pattern of similar constitutional violations caused by insufficient training. (Resp. to LVMPD MSJ 14:5–11). As described above, however, the Use of Force reports do not necessarily demonstrate constitutional violations. And even assuming, without deciding, that LVMPD's handcuffing training policies are inadequate, there is no evidence that "the need for more or different training [was] so obvious"

that LVMPD was deliberately indifferent to Kalenowski's rights. *City of Canton*, 489 U.S. at 390.  Thus, LVMPD's Motion for Summary Judgment is GRANTED.

## IV.                    <u>CONCLUSION</u>

**IT IS HEREBY ORDERED** that Defendant Miller's Motion for Summary Judgment, (ECF No. 104), is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant Martin's Motion for Summary Judgment, (ECF No. 105), is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant Fortner's Motion for Summary Judgment, (ECF No. 106), is **GRANTED**.

**IT IS FURTHER ORDERED** that LVMPD's Motion for Summary Judgment, (ECF No. 103), is **GRANTED**.

**IT IS FURTHER ORDERED** that the remaining parties will have thirty days from the date of this Order to file a jointly proposed pretrial order pursuant to LR 16-3(b) using the form provided in LR 16-4.

**DATED** this  21  day of August, 2024.

_____
Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT